**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

**STANLEY J. NEISHEL,**                       :

　　　　**Plaintiff**                    :        **CIVIL ACTION NO. 3:05-2461**

　　　　**v.**                           :             **(CAPUTO, D.J.)**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　**(MANNION, M.J.)**
**CITADEL BROADCASTING**                       :
**CORPORATION,**
　　　　　　　　　　　　　　　　　　　　　　　:
　　　　**Defendant**
　　　　　　　　　　　　　　　　　　　　　　　:

**REPORT AND RECOMMENDATION**

Pending before the court is the defendant's motion for summary judgment.  (Doc. No. 15).  Based upon the court's review of the record, it is recommended that the defendant's motion be granted.

By way of relevant background, on November 25, 2005, the plaintiff initiated the instant action alleging violations of the Age Discrimination in Employment Act, ("ADEA"), 29 U.S.C. §§621, et seq., the American's with Disabilities Act, ("ADA"), 42 U.S.C. §§12101, et seq., and the Pennsylvania Human Relations Act, ("PHRA"), 42 P.S. §955(a)[1].  (Doc. No. 1).  An answer to the complaint was filed on April 14, 2006.  (Doc. No. 4).

On July 30, 2007, the defendant filed the instant motion for summary judgment, (Doc. No. 15), along with a supporting brief, (Doc. No. 16), and

---

[1]The plaintiff had originally also set forth a claim for intentional infliction of emotional distress.  (Doc. No. 1).  However, he has since conceded that this claim is barred by the exclusivity provisions of the PHRA, and agrees that this claim should be dismissed.  (Doc. No. 23, p. 17).

statement of material facts, (Doc. No. 16).  After the resolution of certain discovery matters, (See Doc. No. 20), on October 5, 2007, the plaintiff filed a brief in opposition to the motion for summary judgment, (Doc. No. 23).  On October 18, 2007, the defendant filed a reply brief.  (Doc. No. 24).

With respect to the instant motion, summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).

The Supreme Court has stated that:

> ". . . [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  Id.  The moving party can

discharge that burden by "showing . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Issues of fact are genuine "only if a reasonably jury, considering the evidence presented, could find for the nonmoving party." Childers v. Joseph, 842 F.2d 689, 693-94 (3d Cir. 1988)(citations omitted).  Material facts are those which will effect the outcome of the trial under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The court may not weigh the evidence or make credibility determinations.  Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).  In determining whether an issue of material fact exists, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the nonmoving party.  Id. at 393.

If the moving party meets his initial burden, the opposing party must do more than raise some metaphysical doubt as to material facts, but must show sufficient evidence to support a jury verdict in its favor.  Id.

In this case, the plaintiff alleges that he was employed as a production manager by TeleMedia Company at the time of its purchase by the defendant, Citadel Broadcasting Company, ("Citadel").  The plaintiff was maintained by Citadel and, as a result of the acquisition, served as a production manager for seven radio stations.

On November 19, 1997, the plaintiff entered into a new agreement for employment with the defendant that provided for an increase in his salary and a promised additional increase each successive year for five years through

3

2002.  The plaintiff alleges that his employment agreement required him to perform the production duties for all seven of the radio stations owned by the defendant in the Wilkes-Barre, Pennsylvania, area without any change or improvement in the production facilities or any additional qualified assistance.

The plaintiff alleges that he came to the defendant with experience in radio production having worked for TeleMedia since 1985 and having been involved with radio broadcasting since 1973.   During his time with the defendant, the plaintiff alleges that his evaluations were favorable, but that he was continuously asked to perform his duties without adequate facilities or proper assistance.

In January 1998, the plaintiff alleges that he was admitted to the hospital for what appeared to be a stroke[2].  He was out of work for eight days and alleges that he had additional time off for testing while employed by the defendant.

Approximately one year after the plaintiff's diagnosed stroke, on January 20, 1999, he was terminated by the defendant.  The plaintiff alleges that his request for assistance resulted in his termination.  According to the plaintiff, his termination was part of a pattern and practice of discrimination by the defendant.

Based upon the above allegations, the plaintiff alleges that the

---

[2]Subsequent to his termination from Citadel, the plaintiff learned that his condition was actually the result of a brain tumor.  (Doc. No. 1, ¶ 16).

4

defendant's conduct constituted unlawful discrimination on account of his age in violation of the ADEA; unlawful discrimination on account of being regarded as having an impairment in violation of the ADA; and unlawful discrimination on account of his age and perceived impairment in violation of the PHRA.  He is seeking compensatory and punitive damages.

In an attempt to controvert the allegations set forth in the plaintiff's complaint and establish that no genuine issue of fact exists for trial, the defendant has submitted a statement of material facts, the following of which are undisputed[3].

Defendant Citadel owns and operates radio stations.  In 1997, Citadel acquired radio stations in the Wilkes-Barre/Scranton market.  The plaintiff was employed as a prodution director by Citadel's predecessor company, Tele-Media Broadcasting Company.  Citadel hired the plaintiff as the production director for the market on July 1, 1997.

During his employment with Citadel, the plaintiff reported to the general manager position.  At the time of the plaintiff's hire, William Betts was the general manager.  After Betts left Citadel, Stu Stanek served as an interim general manager, until he promoted Regina Todd to the position on September 1, 1998.

---

[3]Although the court ends its analysis at the *prima facie* stage on each of the plaintiff's claims, all of the undisputed material facts set forth by the parties have been included herein.

As a production director, the plaintiff was required to "multitask." His duties included management of the production department and its employees, creation of a production schedule, action production of commercials and voice work, maintenance of production equipment, and billing of clients for certain production services. The plaintiff was required to work with the traffic and sales departments to coordinate and make sure all production work was accomplished.

Citadel assigned another employee, Christopher Norton, "to handle the stuff that [plaintiff] [couldn't] handle more or less. Especially talking to certain salespeople who just could not get in their heads what [they were] doing."[4]

Prior to January 1998, the plaintiff testified that there was job-related stress, and that he put in long hours. In fact, from 1997 onward, the plaintiff testified that everyone at Citadel was being asked "to do more with less."

Prior to January 22, 1998, the plaintiff experienced no medical problems or symptoms. On the morning of January 22, 1998, the plaintiff called Carole Marchwat, sales manager for one of the Citadel stations, stating, "I don't feel good. Just tell [Citadel] I am not coming in." On January 23, 1998, the plaintiff again called Marchwat, telling her that he had passed out and could not come to work because "[He] [didn't] feel right." The plaintiff took sick leave from

---

[4]The plaintiff admits that this statement is correct, but further states that Christopher Norton had no experience in radio production and was not helpful to him except to handle two to three of fifteen salespeople that had limited experience. (Doc. No. 23, ¶8).

6

January 22, 1998, through January 28, 1998, when he returned to his production director position without any limitations or restrictions imposed by a doctor[5].

Upon returning to work, the plaintiff did not request any assistance in getting his work performed because of residuals from his illness[6]. The plaintiff's follow-up physicians' appointments were scheduled outside of working hours. The plaintiff was not a participant in the Citadel health insurance benefit plan, and did not provide Citadel with any medical records regarding his condition during his employment.

Upon questioning, the plaintiff was unclear as to whether he had discussed his medical status or hospitalization with any managers at Citadel.[7] Although the plaintiff testified that Regina Todd could have found out about his

---

[5]Although the plaintiff testified that he had no limitations or restrictions imposed upon him by his doctors, (Doc. No. 16, Pl.'s Depo., pp. 126, 132), he also testified that he had difficulty with his memory and recalling names and numbers following the onset of his illness. (Doc. No. 16, Pl.'s Depo., p. 110).

[6]The plaintiff indicates that he continuously asked for help because the operation grew from two radio stations to nine radio stations and the sales staff grew from five to fifteen. (Doc. No. 16, Pl.'s Depo., pp. 37, 40). He testified, however, that he never requested additional help because of residuals from his illness. (Doc. No. 16, Pl.'s Depo., pp. 133-34).

[7]The plaintiff gave conflicting testimony first stating that he did not discuss his medical condition with any managers at Citadel, (Doc. No. 16, Pl.'s Depo., p. 131), including Regina Todd, (Doc. No. 16, Pl.'s Depo., p. 161), but also testifying that he may have discussed his medical condition, but could not recall whether he did so or not, (Doc. No. 16, Pl.'s Depo., pp. 129, 132).

condition from other employees, he testified that he did not know that she ever did, and that she never discussed that with him. (Doc. No. 16, Pl.'s Depo., pp. 161-62).

No one at Citadel ever gave the plaintiff any indication that they believed that he was disabled or unable to perform his job duties as a production director as a result of any medical condition[8]. (Doc. No. 16, Pl.'s Depo., p. 132). Moreover, the plaintiff testified that he had no reason to believe that Citadel management viewed his medical status as limiting his work abilities in any way[9].

During Regina Todd's tenure as a general sales manager, she had no supervisory responsibility over the plaintiff. However, she was later promoted to general manager on September 1, 1998. At some point, Citadel purchased lockers for its employees, and Todd decided that the plaintiff should be in charge of the keys and make a schedule of who was assigned to each locker. The plaintiff called this a "nonsensical request" because this assignment was unrelated to his responsibilities as a production manager and placed additional responsibilities upon him.

---

[8]Although the plaintiff indicates that this statement is "denied," the response does not address the substance of the statement. Moreover, his deposition testimony is contradictory. (Doc. No. 16, Pl.'s Depo., p. 132).

[9]Again, although the plaintiff indicates that this statement is "denied," his deposition testimony is directly contradictory. (Doc. No. 16, Pl.'s Depo., p. 133).

The plaintiff also characterized Todd's request for him to put in a production schedule every week as "nonsensical work."  Todd told plaintiff on numerous occasions to prepare a weekly production schedule.  The plaintiff remembers Todd speaking to him during his employment about the production schedule requirement. The plaintiff told Todd that he would prepare the schedule.  Although he did so initially, he testified that he stopped preparing the schedule because of a lack of sufficient working space and a lack of cooperation from on-air personalities.  (Doc. No. 16, Pl.'s Depo., p. 156).

The plaintiff characterized Todd's suggestion to place an advertisement for assistance in replacing Tom Jenkins in Radio & Records Magazine as "stupid."   The plaintiff testified that he did so because he knew there would be no response because the salary would not attract anyone for the position. Despite this, the plaintiff testified that he placed the advertisement and received no response.  (Doc. No. 16, Pl.'s Depo., p. 95).

At some point, the plaintiff was also given the responsibility for "co-op scripts" and the billing for same[10].  The plaintiff admits that he was sending some co-op scripts out without the required billing[11].

---

[10]The plaintiff admits that he was given this additional responsibility, but indicates that it would normally be the responsibility of the traffic department. (Doc. No. 23, Plaintiff's Counterstatement of Material Facts, ¶41; Doc. No. 16, Pl.'s Depo., p. 153).

[11]The plaintiff explains that this was done because he was overworked and his request for help when unanswered by management.  (Doc. No. 16, (continued...)

In response to the plaintiff's requests for help, in November of 1998, Rob Astleford was hired as a new full time employee to work in production[12].

Also in November 1998, the plaintiff received a memorandum from Yvette DeCinti, business manager, referencing production problems.  In December 1998, the plaintiff acknowledged that "it seems we are having a problem getting production done.[13]"

The plaintiff testified that since Todd was "in charge," he did not want to work at Citadel anymore at the time he was separated[14].

On January 20, 1999, the plaintiff was called in to a meeting with Todd and two other managers.  He was informed that he was being separated from

---

[11](...continued)
Pl.'s Depo., pp. 152-53).

[12]The plaintiff admits this statement, but indicates that because Tom Jenkins had left the production department earlier in 1998, his department was understaffed, and that the addition of Astleford did not add needed qualified production people.  (Doc. No. 23, Plaintiff's Counterstatement of Material Facts, ¶33).

[13]The plaintiff testified that the problems in production involved personnel outside of his control and insufficient help in the production department.  (Doc. No. 16, Pl.'s Depo., p. 172).

[14]Although the plaintiff indicates that this statement is "denied," his deposition testimony is contrary.  (Doc. No. 16, Pl.'s Depo., p. 156). Moreover, although the plaintiff denies the statement, he indicates that "[his] statement must be considered in light of the additional work load, lack of appropriate help and the inexperience of Regina Todd who was terminated by the defendant in August of 2000."  (Doc. No. 23, Plaintiff's Counterstatement of Undisputed Material Facts, ¶45).

employment because Todd felt he was not happy working at Citadel Broadcasting, he had not put a production schedule in place, and the co-op scripts had not gone out with the billing[15]. (Doc. No. 16, Pl.'s Depo., pp. 94-5).

When asked what he believed was the motive for his discharge, the plaintiff testified that he had "no idea," but felt that Todd suggested that he be discharged.  The plaintiff concedes that none of the individuals involved in deciding to terminate him ever made any comments about his medical status.  Moreover, the plaintiff admits that neither Todd nor Stanek ever made any comments to him about his age.

The plaintiff, who was born on April 29, 1953, was replaced by Christopher Norton, whose date of birth is May 6, 1953[16].

The plaintiff filed a charge of discrimination with the Pennsylvania Human Relations Committee, ("PHRC"), on or about June 4, 1999.  The PHRC closed its investigation on November 25, 2003.

---

[15]In partially denying this statement, the plaintiff explains why some of the co-op scripts went out without billing, but does not deny that these were the reasons given for his separation. (Doc. No. 23, Plaintiff's Counterstatement of Undisputed Material Facts, ¶ 46).

[16]The plaintiff denies this statement indicating that he has no knowledge about what individuals were hired to do his production work because the defendant objected to his Interrogatory Number 10 concerning new employees, date of hire, position and date of birth. (Doc. No. 23, Plaintiff's Counterstatement of Material Facts, ¶53). However, upon review, the defendant's answers to the plaintiff's Interrogatories 8 and 16 adequately provide this information.

Based upon the undisputed facts, the defendant initially argues that it is entitled to summary judgment on the plaintiff's disability discrimination claim.

With respect to the plaintiff's ADA and related PHRA claims[17], the plaintiff is required to establish three elements in order to make out a *prima facie* case: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination. Buskirk v. Apollo Metals, 307 F.3d 160 (3d Cir. 2002)(citing Gaul v. Lucent Technologies, Inc. , 134 F.3d 576, 580 (3d Cir. 1998)).

For purposes of the first element, the ADA defines a disability as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;  (B) a record of such an impairment; or (C) being regarded as having such an impairment.  42 U.S.C. §12102 (2); Sutton v. United Airlines Inc., 527 U.S. 471, 478 (1999).

In this case, the plaintiff has only alleged that he was discriminated against on the basis of a perceived disability, not an actual disability or record

---

[17]The PHRA and the ADA are "basically the same . . . in relevant respects and 'Pennsylvania courts . . . generally interpret the PHRA in accord with its federal counterparts.'" Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir.2002) (alteration in original) (quoting Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir.1996)).

of disability.  (Doc. No. 1, ¶ 21).  The regulations addressing this category of disability define an individual who "is regarded as having such an impairment" as one who: (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitude of others toward such impairment; or (3) has none of the impairments defined in paragraph (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.  In considering these factors, a court must consider the information the employer had regarding the employee's medical condition and its response thereto.  Buskirk v. Apollo Metals, 307 F.3d at 167.

Here, there is virtually no evidence that members of Citadel's management had any information regarding the plaintiff's condition.  Although the plaintiff testified that he may have discussed his hospitalization or condition with Regina Todd, he further testified that he probably would not have because he would not know how to describe his condition to her.  (Doc. No. 16, Pl.'s Depo., pp. 129-32).  The plaintiff was not on Citadel's health insurance plan, and he admits that he did not provide Citadel with any of his medical records.  (Doc. No. 16, Pl.'s Depo., pp. 133-35).  The plaintiff admits that no one at Citadel told him that they believed that he was disabled or unable to perform any duties on account of his medical condition.  (Doc. No.

13

16, Pl.'s Depo., pp. 126, 132-33).  In fact, the plaintiff indicated that he was not only returned to his regular duties upon coming back to work, but was given additional duties on top of those which he had before.  Plaintiff testified that he had no reason to believe that anyone at Citadel viewed his medical condition as impairing his ability to work in the job with which he was employed or any other job.  (Doc. No. 16, Pl.'s Depo., p. 133).  The plaintiff testified that he never presented Citadel with any job restrictions because he did not have any.  (Id.).  The plaintiff did not request any assistance in getting his job performed because of his medical condition.  (Doc. No. 16, Pl.'s Depo., pp. 133-34).  Finally, the plaintiff testified that none of the decisionmakers at Citadel ever made any comments, negative or otherwise, to him regarding his medical status.  (Doc. No. 16, Pl.'s Depo., p. 187).

Although the plaintiff testified that managers could have known of his condition because his memory loss was obvious or through information known to his co-workers, the mere fact that an employer is aware of an employees impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that the perception caused the adverse employment action.  See e.g. Salley v. Circuit City Stores, Inc.  160 F. 3d, at 981 (3d  Cir. 1998).   The plaintiff must prove that the employer considered him to be "substantially limited in performing either a class of jobs or a broad range of jobs in various classes."   Walters v. Potter, 2007 WL 693978 (M.D.Pa. 2007)(citing Howell v. Sam's Club, 959 F.Supp. 260, 267 (E.D.Pa. 1997);

14

Wilson v. M.V.M., Inc., 475 F.3d 166 (3d Cir. 2007)).  There is no indication from the record in this case that Citadel considered the plaintiff to be "substantially limited in performing either a class of jobs or a broad range of jobs in various classes."  Citadel did not change any of the plaintiff's original job duties and, in fact, gave him additional duties to handle upon his return to work.  Further, there is no indication that Citadel took any other actions which would indicate that it regarded the plaintiff as incapable of performing his job duties.  Therefore, the plaintiff has failed to establish that Citadel regarded him as disabled and has failed to establish a *prima facie* case with respect to his ADA and related PHRA claims.  On this basis, the defendant's motion for summary judgment should be granted.

The defendant further argues that the plaintiff has failed to establish a *prima facie* case under the ADEA and PHRA[18].

With respect to the plaintiff's claims under ADEA and PHRA, in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the Supreme Court set forth a procedure for the presentation of evidence in a discriminatory treatment case brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 et seq.  The Third Circuit has applied a slightly modified

---

[18]As with the plaintiff's ADA claim, "the same legal standards and analysis are applicable to claims under both the ADEA and the PHRA and hence it is not uncommon to address such claims collectively."  Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 509 n.2 (3d Cir. 2004) (internal quotation omitted).

version of the McDonnell Douglas scheme to actions brought pursuant to the ADEA. See Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997); Waldron v. SL Industries Inc., 56 F.3d 491, 494-95 (3d Cir. 1995); Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995); Torre v. Casio, Inc., 42 F.3d 825, 829-30 (3d Cir. 1994).

The ADEA analysis consists of four (4) steps. At the first step, the plaintiff must establish a *prima facie* case. See Keller, 130 F.3d at 1108 (citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993)). In order to establish a *prima facie* case, a plaintiff must prove, by a preponderance of the evidence, that the plaintiff (1) belongs to a protected class (i.e., was forty (40) years of age or older, See 29 U.S.C. §631(a)); (2) was qualified for the position; (3) was dismissed despite being qualified; and (4) ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination. Keller , at 1008. See also Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326 (3d Cir. 1995); Maxfield v. Sinclair International, 766 F.2d 788, 793 (3d Cir. 1985).

With respect to the instant action, the plaintiff has presented no evidence that he was replaced by someone sufficiently younger in order to create an inference of age discrimination. The record establishes that plaintiff, born on April 29, 1953, was replaced by Christopher Norton, whose date of birth is May 6, 1953, making him only one week younger than the plaintiff. In considering the "sufficiently younger" standard, "'there is no particular age

difference that must be shown, but while different courts have held . . . that a five year difference can be sufficient, . . . a one year difference cannot.'" Monaco v. American Gen'l Assurance Co., 359 F.3d 296, 307 (3d Cir.), cert. denied, 543 U.S. 814 (2004)(quoting Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 236 (3d Cir.1999)) (omissions in original).  If a one year age difference cannot be sufficient, a one week difference certainly is not sufficient.  Therefore, the plaintiff has also failed to establish a *prima facie* case with respect to his ADEA and related PHRA claims, and the defendant is entitled to summary judgment on these claims as well.

On the basis of the foregoing, **IT IS RECOMMENDED THAT:**

the defendant's motion for summary judgment, **(Doc. No. 15)**, be

**GRANTED**.

s/ *Malachy E. Mannion*

**MALACHY E. MANNION**
**United States Magistrate Judge**

**Date:** January 10, 2008

O:\shared\REPORTS\2005 Reports\05-2461.01.wpd

17